CASES ARGUED AND DECIDED

IN THE

# SUPREME COURT OF MISSISSIPPI

AT THE

## OCTOBER TERM, 1910.

LEE WILTCHER v. STATE.

[54 South. 766.]

1. CRIMINAL LAW. Homicide. Dying declarations. Admissibility. Conduct of judge. Coercion of jury.

The jury, when it retires to consider its verdict, should be left absolutely free from any and all outside influences so that it may consider the case submitted to them with perfect freedom.

2. SAME.

Where the jury retired to consider of their verdict between seven thirty and eight o'clock Friday evening and on the following Saturday evening sent a note to the judge, through the bailiff, "asking permission to take a walk on Sunday morning and evening," and saying that they were hopelessly hung, and the judge sent them word by the bailiff that "he would receive a verdict, if it was brought in by nine o'clock, but if not, he was going to Hazlehurst and would not be back until Monday morning," and that he would not receive a verdict on Sunday, and further gave the jury permis-

(374)

sion to take a walk on Sunday morning and evening; and the jury reached a verdict about nine o'clock Saturday night. *Held,* that the message of the judge was not an improper communication to the jury and had no tendency to coerce them into a verdict.

3. DYING DECLARATION. *Admissibility. Homicide.*

Where the dying man when told a few minutes after he had been shot that a doctor had been sent for said, "the doctor can't do me any good, I won't be here long," and then made a statement as to how he was killed, which was in substance the same as the statement he made to another witness some twelve hours later; and the testimony showed that the dying man grew weaker and weaker until he died and never at any time expressed any hope of recovery. *Held,* that the admission in evidence of the last declaration was not error.

4. HOMICIDE. *Admission of evidence. Harmless error.*

In a murder case, the admission of evidence that decedent's wife, shown to have been a conspirator with accused, had told witness, at a time before the conspiracy was formed, that she, the wife, was going to have her husband killed, and testimony of a witness that, while she and another, conspirator with accused, were going to decedent's house the night that he was killed, such conspirator stated to witness, some ten or fifteen minutes before the fatal shot was fired, and when the conspirator was not more than ten or twenty yards from the spot where decedent was killed, that he, the conspirator, was going to kill decedent, and that, if he did not, accused and another would kill such conspirator that night or early the next morning, though erroneous, was harmless error, where the indictment charging accused with murder was legally returned, and he was tried by an impartial jury, and the evidence established his guilt, inasmuch as the improper evidence did not deprive accused of a substantial right, and could not possibly have changed the verdict.

APPEAL from the circuit court of Yazoo county.

HON. D. M. MILLER, Judge.

Lee Wiltcher was convicted of murder and appeals. The facts are fully stated in the opinion of the court.

*Barbour & Henry,* for appellant.

It was manifest error, and highly prejudicial to appellant to permit the witness, Bettie Price, to testify over

objection that one month before the murder of deceased, that Mrs. Wiltcher told her that she was going to have her husband killed, and failing in this, she would kill him herself. The court will notice from the transcript that objection was repeatedly made to this testimony because it appeared from the witness' own statement that it was three weeks or a month before the murder. The only evidence connecting appellant with any conspiracy, and in fact the only reference to that effect, was the testimony of Will Price, who said that the only times Lee Wiltcher ever offered to have his brother killed was on Saturday preceding the Saturday night of the murder (one week exactly) and on Friday, the day preceding the homicide, and of Tom Brokeman, that appellant talked to him on Wednesday before the killing, yet the court permitted this witness to detail conversations she had with Mrs. Wiltcher, weeks before there is any claim even, by the state, that appellant was her co-conspirator. The effect was to get to the jury conversations, showing Mrs. Wiltcher's purpose and desire and reason to have her husband killed, out of the hearing of appellant, and without his knowledge. The prosecuting attorney realizing the incompetence of the declaration, stated to the court that he would show that the old lady was off on the dates," a promise he did not even offer to keep. The court, realizing that the evidence was improper, as the record then stood, said: "The court will consider the matter and rule later." Immediately, the record shows, the jury was brought back, and all this incompetent testimony given before them, the court finally being generous enough to give appellant the benefit of an exception. We can conceive of no testimony, in a case like this, that could be more damaging.

That this testimony was incompetent under all the authorities is too plain. "Acts and declarations done and made before the formation of the conspiracy are not admissible against the co-conspirator unless brought

home to them, or made in their presence." Ency. of
Evidence, vol. 3, p. 430; 34 N. W. 720; 9 So. Rep. 847; 34
Am. Rep. 746; 61 S. W. 735; 54 S. W. 211; 94 Ill. 299;
12 N. E. 865.

In order to make evidence admissible on the theory that
there was a conspiracy between the defendant and others
jointly indicted, it is necessary that it should be shown
that the conspiracy was pending at the time of the state-
ment, if made out of the presence of the co-conspirator.
*Langford* v. *State,* 30 So. Rep. 503.

The identical question is decided, and held to be rever-
sible error in the case of *Gillum* v. *State,* 62 Miss. 548.

During the examination of Rosa Moore, or Rosa Price,
the court, over the objection of the defendant's attor-
neys, permitted her to testify as follows:

"Q.  What did he say, if anything, about what he was
going up there for? (meaning Will Price).

"A.  He told me to go up there with him, that he
wanted to borrow some money from Mr. John Wiltcher,
and after we got nearly to the house, he said, 'I am going
to kill Mr. Wiltcher,' and I begged him not to and said,
'I would not do it,' and he said, 'If I don't kill him, cousin
Rosa, Mr. Lee and Miss Lula are going to kill me to-night
or early in the morning.' He goes on and I steps in the
shop and sticks my fingers in my ears to keep from hear-
ing it."

This conversation between the witness and Will Price,
as shown by her testimony, occurred ten or fifteen min-
utes before the shooting.

As stated in the argument of the facts in this brief,
this is the only corroboration, or the only effort at cor-
roboration, of the witness Will Price to the effect that
Lee Wiltcher was present on the night of the homicide.
The damaging effect of this testimony is manifest. The
average juror, strange to say, regards a statement,
whether self serving or not, out of court, corroborative
of the testimony of the witness upon the stand, as strong

testimony. The court permitted this testimony on the theory that it was competent as the act or declaration of a co-conspirator, the alleged conspiracy having been shown by the testimony of Will Price. My view of this testimony is that it is not the declaration of a co-conspirator "in furtherance of and in execution of the unlawful design." Unless it was such declaration, it was clearly incompetent because made in the absence of the appellant, and in no way ratified or approved by him.

Our court, in this case of *Gillum* v. *The State,* 62 Miss. 547, uses the following language: "After a conspiracy has been established by evidence *aliunde,* the declaration and acts of each conspirator in the furtherance of the common design are admissible against all, but it is necessary that such acts and declarations be shown to have been made or done in the prosecution of the common purpose. They are admissible as parts of the *res gestae,* and declarations or admissions which are not themselves acts, and do not illustrate or interpret contemporaneous acts, do not partake of the nature of the *res gestae,* and are inadmissible against any others save those by whom they are made. 1 Philips on Evidence, 698. The threats and declarations of Thomas and Harry Gillum, which were proved against the defendant, were none of them made while the parties were engaged in any attempt to kill or injure the deceased."

It could not seriously be considered that this consideration by Will Price of his reason for the assasination, in any way illustrated or interpreted any contemporaneous act connected with the execution of the conspiracy. Of course, if at the same time he was upon the scene and John Wiltcher was being called out of his house, he had made any statement, this, of course, would have been part of the *res gestae* of the crime contemporaneous with its execution, and illustrative of his act in killing the deceased. But for him to state fifteen minutes before anything is done in execution of the alleged unlawful

design, in a confession, was no more competent than if
he had confessed it two days before, because it did not
illustrate or interpret any contemporaneous act in fur-
therance of any in execution of the unlawful design.

In the case of *Metcalf* v. *Conner*, 12 Am. Dec. 340, this
very question is discussed, the court there saying:

"Any declarations by one of the party at the time of
the committing the unlawful act, are no doubt not only
evidence against himself, but as being a part of the *res-
gestae* and tending to determine the quality of the act,
are also evidence against the rest of the party, who are
equally as responsible as if they had themselves done the
act. But what one of the party may have been heard to
say at any other time as to the share which others had
in the transaction, or as to the object of the conspiracy,
cannot be admitted as evidence to affect them, for it has
been solemnly decided that a confession is evidence only
against the person himself who makes the confession, and
not against others."

In the case of the *State* v. *Tice*, 48 Pac. Rep. 367, the
court admitted proof of what one of the alleged conspira-
tors not on trial narrated to the witness concerning what
the witness designated he "supposed was the history of
this instrument" (it being the trial for the forging of a
will). The court held that it was reversible error, and
said, "It was a subsequent narration of the transaction,
and could not be considered as a part of the *res gestae*
or as declarations concurrent in time with the commis-
sion of the unlawful act." Citing with approval the case
of *Metcalf* v. *Conner*. The court held that this was error.

"On the separate trial of one charged with aiding an-
other in a murder, the acts done by that other and con-
versations had with him in the absence of defendant are
incompetent as evidence of the defendant's guilt." This
was a trial upon the charge of murder where the appel-
lant and his uncle were charged to have entered into a
conspiracy to cause the death of a party. Certain state-

ments of the co-conspirator not on trial in the absence of
the defendant, and which were merely narrative of the
purpose or intention of the co-conspirator relative to the
death of the deceased, were admitted in evidence. The
court discussed the question here involved and reversed
this case because of the admission of this evidence, hold-
ing that it was not in furtherance of or in execution of
the unlawful design at the time the incriminating state-
ments were made, but were in the nature of confessions
or narrations. *Osmun* v. *Winters,* 46 Pac. Rep. 780;
*Sheppard* v. *Yocum,* 10 Ore. 417; see, also, *State* v. *Fred-
ericks,* 85 Mo. 145; *State* v. *Duncan,* 64 Miss. 263.

Philips on Evidence, vol. 1, par. 205, lays down a rule
as follows: "Where several persons are proved to com-
bine together for any illegal purpose, any act done by
one of the party in pursuance of the original concerted
plan and with reference to the common object is in con-
templation of the law, the act of the whole party. It
follows therefore that any writings or verbal expressions,
being acts themselves or illustrating and explaining other
acts, and so being part of the *res gestae,* and which are
brought home to one conspirator, are evidence against
the other conspirators, provided it sufficiently appears
that they were used in furtherance of the common de-
sign." And the author afterwards, at page 208 of the
same volume, adds: "But where words or writings are
not acts in themselves, nor part of the *res gestae,* but a
mere relator's narration of some part of the transaction,
or as to the share which other persons have had in the
execution of the common design, the evidence is not with-
in the principle above mentioned. It altogether depends
upon the credit of the narrator who was not before the
court, and it could not therefore be received."

The case of *Sample* v. *The People,* 13 N. E. 536, de-
cided by the supreme court of Illinois in 1887, is di-
rectly in point on the proposition here involved.

The action of the court in admitting the alleged dying declaration of John Wiltcher, through the testimony of Dr. Frissell, was so manifestly incompetent and so clearly improper, that we hardly know how to argue the proposition. This court has held so many times that a dying declaration is not competent unless there is clearly made preliminary proof that when the declarant made it, he made it with the solemn belief in his mind that he was going to die, and that this condition of his mind takes the place of the solemnity of an oath. Of course this state of mind by the declarant can only be shown by his conduct, by his expressions of belief of impending death, or by suggestion to him by others that he was going to die, and the belief by him, as evidenced by word or deed, of his belief of that fact.

The position of this court upon the question of the competency of the dying declaration is stated in the following decisions: *Owens* v. *State,* 59 Miss. 547; *Ellis* v. *State,* 65 Miss. 48; *Helm* v. *State,* 67 Miss. 562; *Simmons* v. *State,* 61 Miss. 243; *Bell* v. *State,* 72 Miss. 510; *Lipscomb* v. *State,* 75 Miss. 559.

The fourteenth assignment of error we regard as the crowning injustice done this appellant on his trial for his life, and that too directly at the hands of the trial judge, who should have held evenly balanced the scales of justice and left the jury free and untrammeled in its deliberation.

Testimony taken upon the motion for a new trial shows that the jury in this case retired about seven thirty o'clock on Friday evening, and that the jury stood, after a number of hours of deliberation, four for acquittal and eight for conviction; that the jury had sent a note to the trial judge, sometime on Saturday evening late, in which they stated to the trial judge that they were hopelessly hung and could not agree upon a verdict. This note was given to the judge by one of the sworn bailiffs, Mr. Ferguson. Upon receipts of this note an astonishing and

shocking thing occurred, as shown by the following question and answer:

"A. What statement did Judge Miller send back to the jury room?"

"A. He said if they reached a verdict before nine o'clock, he would receive it. He said he would not receive a verdict on Sunday. He said he would receive a verdict, if it was brought in by nine o'clock, but if not, he would go on to Hazlehurst and would not be back till Monday morning."

From this it appears that a jury well divided and hopelessly hung on the question of the guilt or innocence of a man being tried for his life, who appealed to the trial judge to discharge them or permit them to take exercise on the next day, being Sunday, instead of discharging this jury, the trial judge sent "back to the jury room" the declaration that if they reached a verdict by nine o'clock that night, he would receive it, otherwise, he would keep them there until the next week, Monday. The transcript shows that promptly, or practically, at nine o'clock, this jury which had reported that it was hopelessly hung, four of them being for acquittal, find a verdict, and that a compromise verdict upon life imprisonment.

Can it possibly be said that this young man, under such circumstances as these received a fair trial? The state does not attempt to clear up the question of whether or not the jury returned the verdict because of the message sent by the trial judge, but elects to leave the record undisputed that the jury, at the hour fixed by the trial judge, brought in its verdict as a result of this coercion. This court has held that where such influence as this is brought to bear upon the jury, that it is presumed that the defendant was prejudiced and that this influenced improperly the jury.

This court in the very late case of *Shaw* v. *The State,* 79 Miss. 577, in a case not so strong as the one at bar,

speaking through Justice Calhoun in strong terms condemned an incident something like the one presented here, and reversed the case.

Concluding, we submit to the court that the transcript in this case shows that this appellant went before the jury burdened with the serious charge of murder, and positively staggering under the load of the accusation that he had assassinated his own brother in order that he might marry that brother's wife, so that any serious error of law must of necessity be regarded as reversible. The facts, when sifted, and the incompetent evidence eliminated, show that the question of the guilt of this appellant is a close one, particularly when the court will recall the perjury that the defense has exposed in the trial of this case, coupled with the feeling against this appellant as shown by the necessity of a change of venue, and the evidence in the transcript shows that an armed mob of thirty on Sunday morning visited the very witnesses who have appeared against this appellant in his trial. Regardless of this, however, even if his guilt is believed to exist by this court, and to appear from the evidence, it cannot be questioned, but that he has been denied rights guaranteed to him by the laws of this state, and injustices have been done him in his trial which have clearly operated against him.

If the common enemy of man was on trial under our laws for his action in regard to

> "The fruit  . . . .
> Of that forbidden tree, whose mortal taste
> Brought death into the world, and all our woe,
> With loss of Eden,"

he should be tried by the rules and customs of our courts. He should not be made the victim of unfairness, and coercion.

*Carl Fox,* assistant attorney-general, for appellee.

It is said that it was manifest error, highly preducicial to the defendant, to permit the witness, Betty Price, to

testify, over the objection of appellant, that a month be-
fore the murder of deceased Mrs. Wiltcher told her that
she was going to have her husband killed, and failing in
this would kill him herself. It is unfortunate that this
evidence was admitted without first determining the
time when this statement was made by Mrs. Wiltcher to
the witness Betty Price. The record does not show, I
think, as is stated by counsel for appellant, that this
statement was made by Mrs. Wiltcher to the witness,
Betty Price. The record does not show, I think, as is
stated by counsel for appellant, that this statement was
made one month before the murder.

So far as the time when the statement was made is
concerned, I have no comment to make, but simply state
the facts as shown by the record, as correctly as I can,
for the information of the court.

It is true, as is stated by counsel for appellant, that
the statement made by one conspirator before the con-
spiracy is formed, should not bind his co-conspirators,
and this rule has a sound basis. It seems to me, how-
ever, that this testimony of Mrs. Wiltcher's statement to
the witness might very well be held competent as show-
ing the state of Mrs. Wiltcher's mind, as one of the cir-
cumstances tending to show that a conspiracy was
formed. The theory of the state was that by reason of
his criminal intimacy with deceased's wife, Mrs. Lulu
Wiltcher, defendant had a motive for the murder of the
deceased; and, further, the theory was that by reason
of that same criminal intimacy, Mrs. Lulu Wiltcher had
a motive for the murder of her husband; and, further,
that both having the same motive, and the same desire
that John Wiltcher should be put out of the way, they
conspired together to have him killed. A conspiracy be-
tween the defendant and Mrs. Lulu Wiltcher could not
be formed without a motive and desire on the part of
Mrs. Lulu Wiltcher to have her husband put to death.
In the condition of her mind, then, any motive which she

might have had to murder her husband was certainly, so far as the logic of the matter is concerned, competent to be proven as one of the circumstances tending to establish the conspiracy. And, since she and the defendant had the same motive to murder her husband, and the same desire for his death, according to the theory of the state, it is more probable that if she entered into a conspiracy at all to murder her husband, it would be with the defendant rather than with some one else having no such motive. The statement, if made before the conspiracy was formed, was inadmissible as proof of a circumstance tending to prove that the conspiracy resulted in the death of her husband, but evidence may be competent for one purpose and incompetent for another. It is admissible, if it is competent for any purpose. Would not proof of the declaration by Mrs. Wiltcher be admissible as a circumstance tending to establish the conspiracy? *Blain* v. *State,* 33 Tex. Crim. 236, 26 S. W. 63; *United States* v. *Logan,* 45 Fed. 872.

The distinction is between a statement made by one of the conspirators before the conspiracy is formed, offered to prove the commission of the crime as a result of a conspiracy; and offered as a circumstance tending to prove the conspiracy itself, and not a crime growing out of the conspiracy.

It is argued by counsel for appellant that it was error to permit Rosa Price, or Rosa Moore, to testify, over objection, that when she and Will Price were going to John Wiltcher's house the night he was killed, Will Price said to her when they arrived at the shop: "I am going to kill Mr. Wiltcher," and "If I do not kill him, Cousin Rosa, Mr. Lee and Miss Lulu are going to kill me to-night or early in the morning." Counsel say: "This conversation between the witness and Will Price, as shown by her testimony, occurred ten or fifteen minutes before the shooting." The shop where she stopped was fifteen or twenty yards from the front gate at John

99 Miss.—25

Wiltcher's house, and she did say that the statement of
Will Price, to which she testified, was made about ten
or fifteen minutes before the gun fired.

Counsel for appellant say that this declaration was in-
competent because it was not made ''in furtherance of
an execution of an unlawful design.'' They argue, fur-
ther, that it was no part of the *res gestae* of the con-
spiracy. *Res gestae* is such a vague and indefinite term
and signifies such a variety of unrelated doctrines, that
I do not think we can obtain any enlightenment by con-
sidering it in that view.   3 Wigmore on Evidence, secs.
1795, 1796, 1797.

It is argued that it was error to admit the dying
declaration John Wiltcher made to Dr. Frisell. This
statement was made after the declaration made to Will
Henderson.   Henderson arrived at John Wiltcher's
house and saw him about ten minutes after he heard the
gun fire, and Dr. Frisell did not get there until three
o'clock A. M., and left about nine A. M.   The dying man
stated to Henderson after Henderson told him that he
had telephoned for Dr. Frisell: ''The doctor can't do
me any good; I won't be here long,'' and then made a
statement to Henderson as to how he was killed.   He
did not die until about eleven o'clock the next day.   If
he knew when Henderson got there that he was dying,
then it certainly is not likely that he had any reason to
believe otherwise when he made the statement to Dr.
Frisell.

The last assignment of error argued by counsel for
appellant is the action of the court in sending a message
to the jury, after they had retired to consider of their
verdict, that if they reached a verdict by nine o'clock
that night he would receive it, but otherwise he would
not, but go to Hazlehurst and would not be back until
Monday morning.   The burden of proof upon this al-
legation made upon the motion for a new trial was upon
defendant below.   The only proof taken to sustain the

motion was the testimony of Mr. Ferguson, who was one of the bailiffs in charge of the jury. Omitting the preliminary questions and answers, his testimony was that the jury brought in a verdict "in the neighborhood of nine o'clock Saturday night," and that he reported it to Col. Harding, but that Judge Miller had gone home to Hazlehurst.

I think all the Mississippi authorities upon this question were cited in the briefs filed in the case of *Tolly May* v. *State,* which case was argued on the 2nd or 3rd instant. See *Alexander* v. *State,* 22 So. (Miss.) 871; *Polk* v. *Jacobs,* 26 Miss, 121-134; *Vicksburg Bank* v. *Moss,* 64 Miss. 644.

In *Show* v. *State,* 79 Miss. 577, the court gave as a reason for holding that such an error was fatal, "there is no evidence that the misconduct of the sheriff worked no injury." It appears from the record in the case at bar that before the judge sent the message to the jury they were in exactly the same frame of mind, with precisely the same thought they would remain locked up until Monday, which it was claimed it was error for the judge to induce by the message.

Argued orally by *J. F. Barbour* for appellant and *Carl Fox,* assistant attorney-general, for appellee.

McLAIN, C.

Appellant, Lee Wiltcher, along with Lulu Wiltcher and Will Price, was indicted in the circuit court of Yazoo county for the murder of one John Wiltcher. Will Price pleaded guilty to the charge, and was sentenced to the penitentiary for life. Lee Wiltcher and Lulu Wiltcher secured a change of venue from Yazoo county to the First district of Hinds county, and at the March term, 1910, of said court, a severance was granted, and Lee Wiltcher was tried, convicted, and sentenced to the penitentiary for life, and from that judgment he appeals to this court.

At the outset we will say that, so far as the facts in this case are concerned, the jury was fully warranted in finding defendant guilty as charged. Therefore we will not go into the details of the testimony, except to say that John Wiltcher, the deceased, was about forty-five years of age, and was the husband of Lulu Wiltcher, who was about thirty-five years of age, and that Lee Wiltcher was a brother to John Wiltcher, being about twenty-one years old. All three parties were white people. The theory of the state was that Lee Wiltcher and Mrs. Wiltcher were on terms of undue intimacy. They desired to get John Wiltcher out of the way. They conspired together to have him killed, and did hire Will Price, a negro, to do the actual shooting, though the evidence shows that both Lee Wiltcher and Mrs. Wiltcher were present, aiding and abetting, at the time John Wiltcher was shot down.

The counsel for appellant assigns as gross error the action of the court in sending a certain message to the jury, after they had retired to consider of their verdict. He characterizes it "as the crowning injustice done this appellant on his trial for his life, and that, too, directly at the hands of the trial judge, who should have held evenly balanced the scales of justice, and left the jury free and untrammeled in its deliberation." Heretofore, in passing upon the principle advocated by appellant, this court, in equally as vigorous language, has said on this question that the jury, when it retires to consider of its verdict, should be left absolutely free from any and all outside influences. When it retires, it is supposed to be alone and in seclusion, so to speak, there to consider the case submitted to them with perfect freedom, and there to deliberate undisturbed by any outward influences. This principle has been emphasized recently by this court in the case of *Tollie May* v. *State*, 54 South, 70. Other cases, in a more or less degree controlling of the question here presented, are as follows: *Green* v.

*State,* 53 South. 415; *Shaw* v, *State,* 79 Miss. 577, 31 South. 209; *Brown* v. *State,* 69 Miss. 398, 10 South. 579; *Tarkington* v. *State,* 72 Miss. 731, 17 South. 768; *Senior & Sons* v. *Brogan,* 66 Miss. 178, 6 South. 649; *Barnett* v. *Eaton,* 62 Miss. 768.

Upon this contested point we will first let the record speak for itself. The only evidence on this point was given by Mr. Ferguson. Upon motion for a new trial, Mr. Ferguson, being duly sworn, testified as follows: "Q. What are your initials, Mr. Ferguson? A. A. J. Q. You were one of the sworn bailiffs in the charge of the jury? A. Yes, sir. Q. Who was the other bailiff? A. Mr. Roberts. Q. What time did the jury arrive at a verdict? A. I can't say exactly. It was some time in the neighborhood of 9 o'clock Saturday night. Q. Whom did you report that fact to? A. We reported it to Col. Harding [the sheriff]. Q. You did that with a view of getting Judge Miller to come back up here? A. Yes, sir. Q. Where was Judge Miller at that time? A. I suppose he was home, in Hazelhurst. Q. Did you deliver him any note from the jury? A. Yes, sir. J. Do you know what was in the note? A. I think it was asking permission to take a walk Sunday morning and evening. Q. Do you remember what statement they made in the note with reference to finding a verdict? A. As well as I remember, they said that they were hopelessly hung. Q. Have you any idea how they stood then? A. Going to supper, Saturday night, I understood there was four for acquittal, four for a life sentence, and four for hanging. Q. And you say they reached a verdict about 9 o'clock Saturday night? A. Yes sir. Q. What statement did Judge Miller send back to the jury room? A. He said, if they reached a verdict before 9 o'clock he would receive it. He said he wouldn't receive a verdict on Sunday." Cross-examination: "Q. Did Judge Miller say they might take a walk? A. Yes, sir. Q. What was it

Judge Miller said when you took him the note? A. He said he would receive a verdict if it was brought in about 9 o'clock, but, if not, he would go to Hazelhurst, and would not be back until Monday morning. Q. When they reached a verdict, you reported to them that Judge Miller had gone to Hazelhurst? A. Yes, sir." It was agreed that the jury retired between 7:30 and 8 o'clock Friday night, after the argument had been closed. It was agreed that the note that was sent to Judge Miller from the jury be filed as an exhibit to this motion, if it can be found.

From this testimony it clearly appears that the jury retired to consider of their verdict between 7:30 and 8 o'clock p. m. Friday evening, and that on the following Saturday evening they sent a note to the judge, through the bailiff, "asking permission to take a walk on Sunday morning and evening," and it further stated "they were hopelessly hung." Judge Miller sent them word by the bailiff that "he would receive a verdict if it was brought in by 9 o'clock, but, if not, he was going to Hazelhurst, and would not be back until Monday morning," and that "he would not receive a verdict on Sunday." Bear in mind that he further stated that permission would be granted them to take a walk on Sunday morning and evening. It is vigorously pressed that this was an improper communication to the jury, and that its tendency was to coerce the jury into a verdict. When this testimony is fairly considered, we think it falls far short of showing that it could have been prejudicial to the interest of defendant. We think the judge acted strictly within his judicial rights, and that what he did was not improper. The action of the judge on this occasion is not violative of any of the principles laid down in the numerous decisions above quoted. In this action of the court, we see no error.

It is strongly contended that the second and third instructions granted the state were erroneous and mis-

leading. We have carefully examined these two instructions, along with all the other instructions in the case, and we are thoroughly satisfied that they, taken as a whole, fairly presented the law of the case to the jury.

Counsel for appellant, with great zeal and earnestness, contends that it was error to admit the dying declaration of John Wiltcher, made to Dr. Frizzell, to the effect that, "when he walked toward the gate at the time he was shot down, he saw two men standing at the gate." Dr. Frizzell stated that, when he was called to see the deceased, it was 4 or 5 o'clock in the morning, and that he found the deceased was mortally wounded, and that he was suffering very much, and that it was his opinion that he must soon die. However, he stated that the deceased did not say to him, or to any one in his presence, that he thought or believed that he was going to die. The court permitted the doctor to relate what the deceased said to him. Abstractly considered, this would not be admissible; but appellant overlooks the fact, when deceased was shot down about 9 o'clock that night, that a Mr. Henderson, a near neighbor, heard the gun fire and the cries of distress, and ran over to Wiltcher's house immediately, and there saw him, which was about ten minutes after he heard the gun fire. The dying man stated to Henderson, after Henderson told him that he had telephoned for Dr. Frizzell, "The doctor can't do me any good; I won't be here long," and then made a statement to Henderson as to how he was killed, which was, in substance, the same thing he told Dr. Frizzel some hours afterwards. The deceased died about 11 o'clock next day. If the deceased knew, when Henderson got there, that he was dying, then it is certainly not likely that he had any reason to believe otherwise when he made the statement to Dr. Frizzell, some seven or eight hours afterwards, when the testimony and his physical condition show that he grew weaker and weaker

from the hour he was shot to the moment of his death.
It is not suggested in the record anywhere that the deceased, at any time during his illness, had or expressed
any hope of recovery. Taking this in the light of the
nature and extent of his wound, his physical state, his
evident danger, his conduct, the occurrence of death soon
thereafter, and all other circumstances connected therewith, we are of the opinion that the trial judge committed no error in admitting as evidence the dying declaration of the deceased as related by Dr. Frizzell.

It is said that is was manifest error, highly prejudicial
to the defendant, to permit the witness Betty Price to
testify, over the objection of appellant, that a month before the murder of deceased Mrs. Wiltcher told her that
"she was going to have her husband killed." It is true,
as stated by appellant, that the statement made by one
conspirator before the conspiracy is formed should not
bind his co-conspirators. The testimony in this case
leaves it in doubt whether the time this statement was
made by Mrs. Wiltcher was before or after the conspiracy was formed; but we rather think that the evidence tends to show more strongly that it was before the
conspiracy was formed. It is further contended that it
was error to permit Rosa Price to testify, over the objection of appellant, that when she and Will Price were
going to John Wiltcher's house, the night he was killed,
Will Price said to her, when they arrived at the shop:
"I am going to kill Mr. Wiltcher. If I don't kill him,
Cousin Rosa, Mr. Lee and Miss Lulu are going to kill
me to-night or early in the morning." The record
shows that this statement was made some ten or fifteen
minutes before the gun fired that killed John Wiltcher,
and at a time when Price was not more than twenty or
thirty yards from the spot where Wiltcher was killed.
It was error in the court in admitting that portion of the
testimony of Bettie Price and Rosa Price as above
pointed out; but, taking into consideration the nature of

their testimony, it is manifest, from the character of all the proof as contained in the whole record, that it was error without injury, harmless error. The indictment charging him with murder was legally founded and returned. He was tried by a fair and impartial jury, composed of his peers. The evidence established his guilt. Indeed, there is nothing in the record suggesting a well-founded doubt upon this question. With the record showing all this, we are unwilling to reverse the case upon a mistaken judgment of the trial judge as to the admissibility of certain testimony, which it is manifest did not deprive the defendant of a substantial right, and could not possibly change the verdict of the jury. After a careful and thorough review of the entire record, we fail to discover any error which will warrant us in setting aside this verdict.

We think the sentence imposed thereon by the court should be inflicted. The evidence shows that he was guilty of a most foul assassination, inspired by as base a motive as ever entered the human heart. Human life is sweet to all. It is a most precious and sacred thing; indeed, it is our all. The one who destroys it, without justification, should be made to feel the iron grasp of the strong arm of the law, by inflicting the punishment prescribed by it. "Laws are made to be enforced. Punishments are prescribed to be inflicted. If men do not respect the law, they must at least be made to fear it, and to know that, while justice may move with a leaden tread, it crushes with an iron heel."

*Affirmed.*

PER CURIAM. The above opinion is adopted as the opinion of the court, and, for reasons therein indicated by the Commissioner, the case is affirmed.